IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

RESOURCE REAL ESTATE SERVICES,  *
LLC
                                *
     Plaintiff,
                                *
v.                                   Civil Action No. GLR-16-168
                                *
EVANSTON INSURANCE COMPANY,
                                *
     Defendant.
                                *

## MEMORANDUM OPINION

THIS MATTER arises out of an insurance-coverage dispute between Plaintiff Resource Real Estate Services, LLC ("Resource") and Defendant Evanston Insurance Company ("Evanston").  Pending before the Court are the parties' Cross-Motions for Summary Judgment.  (ECF Nos. 12, 18).  Principally at issue is whether the parties' insurance contract requires Evanston to defend and indemnify Resource in a lawsuit related to settlement services that Resource provided.  The Motions are ripe for disposition, and no hearing is necessary.  See Local Rule 105.6 (D.Md. 2016).  For the reasons outlined below, the Court will deny Resource's Motion and grant Evanston's Motion.

### I.    BACKGROUND

#### A.   The Policy

In November 2014, Evanston issued Resource a Professional Liability Insurance Policy (the "Policy").  (Compl. ¶ 10, ECF No. 1).  The Policy provides that, subject to conditions not relevant to this case, Evanston is obligated to pay Resource for claims related

to "Wrongful Act[s]" that Resource commits in the performance of "Professional Services." (Compl. Ex. A ["Policy"], at 15, ECF No. 1-1). A Wrongful Act is "any negligent act, error or omission in Professional Services," (id. at 17), and Professional Services include "settlement services" and "title insurance," (id. at 27).

The Policy excludes from coverage any claim "arising out of any actual or alleged conversion, misappropriation, commingling, defalcation, theft, disappearance, [or] insufficiency in the amount of escrow funds, monies, monetary proceeds, funds or property, or any other assets, securities, negotiable instruments or any other thing of value." (Id. at 4). These exclusions apply "irrespective of which individual, party, or organization actually or allegedly committed or caused in whole or part the conversion, misappropriation, commingling, defalcation, theft, disappearance, [or] insufficiency in amount." (Id.). The Policy also provides that Evanston "shall have the right and duty to defend and investigate" any claim covered under the Policy. (Id. at 20).

**B.    The Settlement and the Proceeds**

On September 30, 2015, Resource performed settlement services for the sale of Richard Deem's home in Dundalk, Maryland (the "Settlement"). (Compl. ¶ 17). Resource issued Deem a check for $223,213.16 (the "Check"), representing the net proceeds from the sale (the "Proceeds"). (Id.). Shortly after the Settlement, Resource received numerous e-mails from someone claiming to be Deem

2

(the "Alleged Imposter"). (Id. ¶¶ 18-21). The email address associated with all the messages was RichardDeem@mail.com (the "E-Mail Account"). (Id. ¶ 18).

Just two days after the Settlement, the Alleged Imposter emailed Resource to request that Resource wire the Proceeds to his account. (Id.). Resource responded that Deem already had the Check for the Proceeds and Resource would not stop payment on the Check until it received evidence that Deem voided the Check. (Id.). The Alleged Imposter then wrote that the Check "was trashed and payment should be stopped immediately." (Id.).

On October 5, 2015, Resource received another email from the Alleged Imposter. (ECF No. 19). This time, the Alleged Imposter requested that Resource deposit the Proceeds in a TD Bank account (the "TD Bank Account"). (Id.). Because it did not appear that Deem's name was on the TD Bank Account, Resource advised that it would not stop payment on the Check or wire the Proceeds to the TD Bank Account unless it received confirmation that the Check was voided or that Deem owned the TD Bank Account. (Id.). Resource then received a voided check corresponding to the TD Bank Account, but advised that it would not wire the Proceeds to the TD Bank Account until it received signed authorization. (Id.). Resource later received such authorization and observed that the signature appeared to match Deem's signature on the settlement documents. (Id.). Resource then placed a stop-payment on the Check and

3

informed the Alleged Imposter that Resource would not wire the Proceeds until it finalized the stop-payment -- a process which could take forty-eight hours.  (Id.).

On October 7 and 8, 2015, the Alleged Imposter emailed Resource to check on the status of the wire transfer.  (Id. ¶¶ 20, 21).  On October 8, 2015, Resource confirmed that it had executed the wire transfer.  (Id. ¶ 21).  Just five days later, Resource "received an e-mail from the E-Mail Account alleging that the E-Mail Account was hacked by an unknown individual" and requesting that Resource disregard all previous e-mails from the E-Mail Account.  (Id. ¶ 22).  That same day, Resource received a call from a representative of SunTrust Bank in Florida, who advised that Deem did not receive the Proceeds from the Check.  (Id. ¶ 23).  Deem allegedly deposited the Check on October 1, 2015.  (Id.).  The SunTrust representative also explained that on October 6, 2015, it received notice of the stop-payment on the Check and advised Deem of the same.  (Id.).

C.  **Deem's Suit and Evanston's Denial of Coverage**

In early December 2015, Deem sued Resource in the Circuit Court for Baltimore County, Maryland, alleging that Resource was negligent in handling the Proceeds (the "Deem Suit").  (Id. ¶ 24).  Deem alleges that at the conclusion of the Settlement, Resource issued him the Check for $223,123.16 in Proceeds.  (Pl.'s Mot. Partial Summ. J. Ex. F. ["Deem's Am. Compl."], ¶ 11, ECF No. 12-8).  The next day, Deem negotiated the Check by deposit into his SunTrust

4

account.  (<u>Id.</u> ¶ 12).  Deem then traveled to Florida and entered into a contract to purchase a new home.  (<u>Id.</u> ¶ 13).  Deem intended to use the Proceeds in his SunTrust account to purchase the new home.  (<u>Id.</u> ¶ 14).  About a week after depositing the Proceeds, however, Deem learned that funds were not in his SunTrust account. (<u>Id.</u> ¶ 15).  Resource advised that it had stopped payment on the check and wired the Proceeds to the TD Bank Account in West Palm Beach, Florida.  (<u>Id.</u> ¶¶ 16, 21).  Deem, however, did not authorize Resource to stop payment on the check or wire the funds to the TD Bank Account.  (<u>Id.</u> ¶¶ 17, 23).  Deem does not maintain an account with TD Bank.  (<u>Id.</u> ¶ 24).  Resource failed to return the Proceeds, leaving Deem without money from the sale of his home and unable to purchase a new home.  (<u>Id.</u> ¶¶ 26, 27).

Shortly after Deem filed his suit, Resource sent a letter to Evanston proclaiming that Evanston had a duty to defend and indemnify Resource.  (Compl. ¶ 28).  Less than two weeks later, Evanston denied coverage for the Deem Suit, explaining that Resource's claim was excluded because it "is wholly based upon or arises out of a theft, disappearance, or insufficiency of the monetary proceeds of the sale of the property."  (<u>Id.</u> ¶ 29).

D.   **Procedural History**

In January 2016, Resource sued Evanston in this Court, seeking declarations that the Policy obligates Evanston to defend (Count I) and indemnify (Count II) Resource in the Deem Suit.[1] (Compl.). Resource then moved for partial summary judgment in May 2016, asking the Court to (1) declare that Evanston has a duty to defend and (2) stay further proceedings regarding Evanston's duty to indemnify. (ECF No. 12).  In August 2016, Evanston filed an Opposition and Cross-Motion for Summary Judgment, seeking a declaration that Evanston has neither a duty to defend nor indemnify. (ECF No. 18). The Cross-Motions for Summary Judgment were fully briefed as of October 2016 (ECF Nos. 18, 22, 23).

## II.   DISCUSSION

A.   **Standard of Review**

In reviewing a motion for summary judgment, the Court views the facts in a light most favorable to the nonmovant, drawing all

---

[1] The Declaratory Judgment Act, 28 U.S.C. § 2201 (2012), grants federal district courts discretion to entertain declaratory judgment actions.  See Wilton v. Seven Falls Co., 515 U.S. 277, 282 (1995). District courts have "discretion to entertain a declaratory judgment action if the relief sought (i) 'will serve a useful purpose in clarifying and settling the legal relations in issue' and (ii) 'will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding.'"  First Nationwide Mortg. Corp. v. FISI Madison, LLC, 219 F.Supp.2d 669, 672 (D.Md. 2002) (quoting Cont'l Cas. Co. v. Fuscardo, 35 F.3d 963, 965 (4th Cir. 1994)).  Because the relief that Resource seeks will resolve the uncertainty giving rise to this case, the Court will entertain this action.

justifiable inferences in that party's favor.  Ricci v. DeStefano, 557 U.S. 557, 586 (2009); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970)).  Summary judgment is proper when the movant demonstrates, through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials," that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(a), (c)(1)(A).

Once a motion for summary judgment is properly made and supported, the burden shifts to the nonmovant to identify evidence showing there is genuine dispute of material fact.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).  The nonmovant cannot create a genuine dispute of material fact "through mere speculation or the building of one inference upon another."  Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985) (citation omitted).

A "material fact" is one that might affect the outcome of a party's case.  Anderson, 477 U.S. at 248; see also JKC Holding Co. v. Wash. Sports Ventures, Inc., 264 F.3d 459, 465 (4th Cir. 2001) (citing Hooven-Lewis v. Caldera, 249 F.3d 259, 265 (4th Cir. 2001)).  Whether a fact is considered to be "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect

the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248; accord Hooven-Lewis, 249 F.3d at 265.   A "genuine" dispute concerning a "material" fact arises when the evidence is sufficient to allow a reasonable jury to return a verdict in the nonmoving party's favor.   Anderson, 477 U.S. at 248.   If the nonmovant has failed to make a sufficient showing on an essential element of her case where she has the burden of proof, "there can be 'no genuine [dispute] as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."   Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986).

When the parties have filed cross-motions for summary judgment, the court must "review each motion separately on its own merits to 'determine whether either of the parties deserves judgment as a matter of law.'"   Rossignol v. Voorhaar, 316 F.3d 516, 523 (4th Cir. 2003) (quoting Philip Morris Inc. v. Harshbarger, 122 F.3d 58, 62 n.4 (1st Cir. 1997)).   Moreover, "[w]hen considering each individual motion, the court must take care to 'resolve all factual disputes and any competing, rational inferences in the light most favorable' to the party opposing that motion."   Id. (quoting Wightman v. Springfield Terminal Ry. Co., 100 F.3d 228, 230 (1st Cir. 1996)). This Court, however, must also abide by its affirmative obligation to prevent factually unsupported claims and defenses from going to

trial.  Drewitt v. Pratt, 999 F.2d 774, 778–79 (4th Cir. 1993).   If
the evidence presented by the nonmovant is merely colorable, or is
not significantly probative, summary judgment must be granted.
Anderson, 477 U.S. at 249–50.

**B.   Analysis**

**1.   Standard for Construing an Insurance Contract**

The parties ask the Court to interpret the Policy to determine
whether it requires Evanston to defend and indemnify Resource in the
Deem Suit.  The Court will interpret the Policy under Maryland law.[2]
In Maryland, contract interpretation is a question of law.  Sy-Lene
of Wash., Inc. v. Starwood Urban Retail II, LLC, 829 A.2d 540, 544
(Md. 2003).  Maryland interprets insurance policies according to
ordinary principles of contract interpretation.  Moscarillo v.
Prof'l Risk Mgmt. Servs., Inc., 921 A.2d 245, 251 (Md. 2007).  The
Court, therefore, will apply the objective law of contract

---

[2] Because the Court has diversity jurisdiction over this case,
the Court must apply Maryland's choice-of-law rules.  See Harvard v.
Perdue Farms, Inc., 403 F.Supp.2d 462, 466 (D.Md. 2005) (citing
Limbach Co., LLC v. Zurich Am. Ins. Co., 396 F.3d 358, 361 (4th Cir.
2005)).  Maryland generally applies the doctrine of lex loci
contractus, which provides that a contract dispute is governed by
the law of the jurisdiction in which the contract was made.  See
Allstate Ins. Co. v. Hart, 611 A.2d 100, 101 (Md. 1992).  When the
contract is an insurance policy, the contract is usually "made" in
"the state in which the policy is delivered and the premiums are
paid."  Francis v. Allstate Ins. Co., 709 F.3d 362, 370 (4th Cir.
2013) (quoting Aetna Cas. & Sur. Co. v. Souras, 552 A.2d 908, 911
(Md.Ct.Spec.App. 1989)).  Resource asserts -- and Evanston does not
dispute -- that Evanston delivered the Policy and Resource paid the
premiums in Maryland.  (See ECF No. 12-1 at 10).  Accordingly, the
Court will apply Maryland's rules of contract interpretation.

interpretation.  See <u>Sy-Lene</u>, 829 A.2d at 546 ("Maryland follows the law of objective contract interpretation.").

Under Maryland's objective approach to contract interpretation, the Court "must first determine from the language of the agreement itself what a reasonable person in the position of the parties would have meant at the time it was effectuated." <u>Gen. Motors Acceptance Corp. v. Daniels</u>, 492 A.2d 1306, 1310 (Md. 1985).  If "the language of the contract is plain and unambiguous there is no room for construction, and a court must presume that the parties meant what they expressed." <u>Id.</u>  In this situation, "the true test of what is meant is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant." <u>Id.</u>  Plain and unambiguous language "will not give away to what the parties thought that the agreement meant or intended it to mean." <u>Id.</u> (citing <u>Board of Trustees v. Sherman</u>, 373 A.2d 626, 629 (Md. 1977)).

The construction of an unambiguous contract is for the Court alone to determine.  <u>Wells v. Chevy Chase Bank, F.S.B.</u>, 768 A.2d 620, 630 (Md. 2001).  Thus, if the Court determines that a contract is unambiguous on a dispositive issue, "it may then properly interpret the contract as a matter of law and grant summary judgment because no interpretive facts are in genuine issue." <u>Cochran v. Norkunas</u>, 919 A.2d 700, 709 n.8 (Md. 2007) (quoting <u>Wash. Metro. Area Transit Auth. v. Potomac Inv. Props., Inc.</u>, 476 F.3d 231, 235

(4th Cir. 2007)).

A written contract is not ambiguous "simply because, in litigation, the parties offer different meanings to the language." Diamond Point Plaza Ltd. P'ship v. Wells Fargo Bank, N.A., 929 A.2d 932, 952 (Md. 2007). Rather, "a written contract is ambiguous if, when read by a reasonably prudent person, it is susceptible of more than one meaning." Calomiris v. Woods, 727 A.2d 358, 363 (Md. 1999) (citing Heat & Power Corp. v. Air Prods. & Chems., Inc., 578 A.2d 1202, 1208 (Md. 1990)). When determining whether a contract is ambiguous, the Court will consider "the character of the contract, its purpose, and the facts and circumstances of the parties at the time of execution." Id. (quoting Pac. Indem. Co. v. Interstate Fire & Cas. Co., 488 A.2d 486, 488 (Md. 1985)). If the terms of a contract are ambiguous, the court may consider extrinsic and parol evidence to ascertain the intentions of the parties. Sullins v. Allstate Ins. Co., 667 A.2d 617, 619 (Md. 1995).

When construing an insurance policy, "[u]nless there is an indication that the parties intended to use words in the policy in a technical sense, [the words] must be accorded their customary, ordinary, and accepted meaning." Lloyd E. Mitchell, Inc. v. Md. Cas. Co., 595 A.2d 469, 475 (Md. 1991) (citations omitted). Maryland does not follow the rule that insurance policies should be construed against the insurer as a matter of course. Dutta v. State Farm Ins. Co., 769 A.2d 948, 957 (Md. 2001). But if the allegations

in Deem's complaint make it uncertain whether the Policy potentially covers Resource's claim, "any doubt must be resolved in favor of [Resource]." Aetna Cas. & Sur. Co. v. Cochran, 651 A.2d 859, 863–64 (Md. 1995).  Similarly, "if no extrinsic or parol evidence is introduced, or if . . . ambiguity remains after consideration of the extrinsic or parol evidence that is introduced, [the ambiguity] will be construed against the insurer as the drafter of the instrument." Sullins, 667 A.2d at 619 (citations omitted).

In Maryland, "[t]he obligation of an insurer to defend its insured under a contract provision . . . is determined by the allegations in the tort actions." Brohawn v. Transam. Ins. Co., 347 A.2d 842, 850 (Md. 1975).  Thus, "[i]f the plaintiffs in the tort suits allege a claim covered by the policy, the insurer has a duty to defend." Id. (citation omitted).  And, "[e]ven if a tort plaintiff does not allege facts which clearly bring the claim within or without the policy coverage, the insurer still must defend if there is a potentiality that the claim could be covered by the policy." Id. (citation omitted).  This is known as the "potentiality rule." See St. Paul Fire & Marine Ins. Co. v. Pryseski, 438 A.2d 282, 286 (Md. 1981) (referring to the rule pronounced in Brohawn as the "potentiality rule").

To ascertain whether an insurer has a duty to defend its insured, the Court must answer two questions. First, "what is the coverage and what are the defenses under the terms and requirements

of the insurance policy?" Id. at 285.  This question focuses upon the language of the policy.  Id.  Second, "do the allegations in the tort action potentially bring the tort claim within the policy's coverage?"  Id.  This question focuses upon the allegations of the tort suit -- not the language of the policy.  Id.  Generally, the potentiality rule only applies to this second question.  Id. Indeed, "when the question of coverage or defenses under the language or requirements of the insurance policy is separate and distinct from the issues involved in the tort suit, the 'potentiality rule' . . . has no application."  Id. at 286.

Additionally, when interpreting an exclusion clause in an insurance contract, "[t]he words 'arising out of' must be afforded their common understanding, namely, to mean originating from, growing out of, flowing from, or the like."  N. Assur. Co. of Am. v. EDP Floors, Inc., 533 A.2d 682, 688 (Md. 1987).  An injury arises out of excluded conduct when the excluded conduct is one cause of the injury -- it need not be the only cause.  For example, in EDP Floors, an EDP employee was intoxicated when he attempted to unload floor tiles from a truck and injured a bystander.  Id. at 683-84. The bystander sued EDP for negligence.  Id. at 684.  EDP cross-claimed against the Northern Assurance Company, EDP's insurer, seeking a declaration that Northern Assurance had a duty to defend and indemnify EDP.  Id.  The insurance policy between Northern

Assurance and EDP excluded claims for damages arising out of the unloading of automobiles.  Id. at 686.

The Maryland Court of Appeals concluded that Northern Assurance's policy excluded the bystander's claims because unloading the truck was at least one cause of the bystander's injuries.  Id. at 688-89.  The Court explained that the phrase "arising out of" "do[es] not require that the unloading of the truck be the sole 'arising out of' cause of the injury; [it] require[s] only that the injury arise out of the unloading of the vehicle."  Id. at 688. Thus, the Court reasoned, "if Davis's bodily injury arose out of EDP's employee's unloading of the truck, then that injury is excluded from coverage."  Id. at 688-89.  This is so, the Court clarified, "regardless of whether the injury may also be said to have arisen out of other causes further back in the sequence of events, such as . . . the employer's negligent failure to supervise the employee."  Id. at 689.

### 2.  Construing the Policy

The Policy unambiguously obligates Evanston to defend and indemnify Resource for any negligent acts that Resource commits while performing settlement services.  The section of the Policy entitled "Insuring Agreement" plainly provides that Evanston will indemnify Resource for all "Claims" concerning "Wrongful Acts" in the performance of "Professional Services."  (Policy at 15).  The Policy also states that Evanston "shall have the right and duty to

14

defend and investigate any Claim to which coverage under this policy applies." (<u>Id.</u> at 20). A Claim exists when Resource receives service of process in a lawsuit. (<u>Id.</u> at 16). A Wrongful Act is any "negligent act, error or omission in Professional Services," (<u>id.</u> at 17), and Professional Services include "settlement services," (<u>id.</u> at 27). There is no dispute that Resource received service of process in the Deem Suit or that Deem alleges Resource was negligent in performing settlement services. (Deem's Am. Compl. ¶¶ 7, 8).

Evanston's duty to defend and indemnify Resource for its negligence, however, is narrowed by seven exclusions (the "Exclusions"). The Policy excludes any Claim "based upon or <u>arising out of</u> any actual or alleged [1] conversion, [2] misappropriation, [3] commingling, [4] defalcation, [5] theft, [6] disappearance, [or] [7] insufficiency in the amount of escrow funds, monies, [or] monetary proceeds." (Policy at 4)(emphasis added). Resource argues that none of these Exclusions apply because the Alleged Imposter committed fraud. Evanston disagrees, contending that "[t]he entirety of the claim and the [Deem Suit] arise out of an actual or alleged theft or conversion of funds held in escrow, causing them to disappear and creating an insufficiency in the amount required to pay the proper owner." (ECF No. 18 at 3).

Because the Court finds no indication that Resource and Evanston intended to use the Exclusions in their technical sense,

the Court must construe them according to "their customary, ordinary, and accepted meaning."   Mitchell, 595 A.2d at 475 (citation omitted). When ascertaining this meaning, the Court may consult case law and dictionaries.   See Cheney v. Bell Nat. Life Ins. Co., 556 A.2d 1135, 1139-40 (Md. 1989).   The Court will review the Exclusions to determine whether Deem's Suit arises out of them.

### a.   Insufficiency of Proceeds

The Court will deny Resource's Motion and grant Evanston's Motion because Deem's Suit arises out of an insufficiency in the amount of the Proceeds.

It goes without saying that to be insufficient means to be not sufficient.   See Webster's Third New International Dictionary Unabridged at 1172 (Philip Babcock Gove, ed., Merriam-Webster 1986) (defining insufficient as "not sufficiently furnished or supplied"). To be sufficient means to be "marked by quantity, scope, power, or quality to meet with the demands, wants, or needs of a situation or of a proposed use or end."   Webster's at 2284.   Sufficient is synonymous with "enough."   Id.

Resource argues that Deem's Suit does not arise out of an insufficiency of Proceeds because Deem alleges that at the Settlement, Resource issued him a check for $223,123.16 -- the exact amount listed on the HUD-1 Settlement Statement.   Indeed, in Thames v. Evanston Insurance Co. -- the only case upon which Evanston relies -- the Court found that the plaintiff's suit arose out of an

insufficiency of funds because there were not enough funds <u>at the</u> <u>time of closing</u>.   No. 13-CV-425-PJC, 2015 WL 7272214, at *7 (N.D.Okla. Nov. 17, 2015), <u>aff'd</u>, No. 15-5125, 2016 WL 7228800 (10th Cir. Dec. 14, 2016).   The Policy, however, does not specify when the insufficiency must exist.   As a result, the Court finds that a reasonable person in the position of Resource and Evanston would have understood that the insufficiency could exist at any time -- before, during, or even after the Settlement.

Deem alleges that approximately one week after he deposited the Proceeds into his SunTrust account, he discovered that all the Proceeds were missing.   (Deem's Am. Compl. ¶ 15).   In other words, Deem alleges that there were not enough Proceeds in his account because he was entitled to $223,123.16 in Proceeds, but his account contained $0 in Proceeds.   Since the timing of the insufficiency is irrelevant, the Court concludes that Deem's Suit arises out of an insufficiency in monetary proceeds.   The Policy unambiguously excludes such an insufficiency.

In sum, the Policy unambiguously requires Evanston to defend Resource against Deem's negligence claims.   Out of the seven Exclusions, however, Deem's Suit arises out of at least one of them: insufficiency in the amount of the Proceeds.[3]   Deem alleges that Resource's negligence caused his injuries, but he also alleges that the insufficiency in the amount of the Proceeds did, too.   For

17

Deem's Suit to arise of an insufficiency of Proceeds, he only needs to allege that the insufficiency was <u>one</u> cause of his injuries.  <u>See</u> <u>EDP Floors</u>, 533 A.2d at 688.  Indeed, it does not matter that Deem's suit may have also "arisen out of other causes further back in the sequence of events," such as Resource's negligence.  <u>See</u> <u>id.</u> at 689. Accordingly, because Deem's Suit arises out of an unambiguous Exclusion, the Court will grant Evanston's Cross-Motion for Summary Judgment and declare that Evanston is not obligated to defend or indemnify Resource in the Deem Suit.

### III. CONCLUSION

For the foregoing reasons, the Court will DENY Resource's Motion for Partial Summary Judgment (ECF No. 12) and GRANT Evanston's Cross-Motion for Summary Judgment (ECF No. 18).  The Court will also DECLARE that Evanston is not obligated to defend or indemnify Resource in the Deem Suit, and direct the Clerk to CLOSE this case.  A separate Order follows.

Entered this 17th day of February, 2017

/s/
_____
George L. Russell, III
United States District Judge

---

[3] Because Deem's Suit arises out of at least one of the Exclusions, the Court need not examine the other Exclusions.